John A. PAVAO, Ronald A. Cota, Wendy A. Fobert, Donald W. Scott, as Representatives for the Class of Aggrieved Employees Denied 60–Day Warn Statutory Notice, Plaintiffs,

v.

BROWN & SHARPE MANUFACTURING COMPANY, Defendant.

Civ. A. No. CA–91–0292P.

United States District Court, D. Rhode Island.

Feb. 18, 1994.

Aram R. Schefrin, Lovett, Schefrin, Gallogly & Harnett, Providence, RI, Charles S. Kirwan, Pawtucket, RI, for plaintiffs.

Thomas C. Keeney, William R. Powers, III, James M. Green, Powers, Kinder & Keeney, Providence, RI, for defendant.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

This case is before this court on an objection by defendant, Brown & Sharpe Manufacturing Company ("Brown & Sharpe") to the Report and Recommendation of Magistrate Judge Boudewyns. Magistrate Judge Boudewyns recommended that summary judgment be entered in favor of plaintiffs with regard to plaintiffs' assertion that Brown & Sharpe ordered a "plant closing" within the meaning of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1993) ("WARN") without providing the required 60 days notice. I affirm Magistrate Judge Boudewyns' Report and Recommendation and grant plaintiffs' Motion for Summary Judgment. Because this is a case of first impression in this circuit, I have chosen to write a separate opinion despite my wholehearted concurrence with Magistrate Judge Boudewyns' Report and Recommendation.

*FACTS:*

As Magistrate Judge Boudewyns provided a succinct summary of the facts in his report and recommendation, I quote it at length.

Brown & Sharpe maintains a place of business at Precision Park, in North Kingstown, Rhode Island ("Brown & Sharpe at Precision Park"). In 1991, Brown & Sharpe was engaged in the manufacture and sale of a number of lines of industrial products, including metrology or measuring devices, grinding machines, turning machines, screw machine tools, and precision tools. Brown & Sharpe at Precision Park had four main "divisions" during all times relevant to this litigation: Corporate Division, Measuring Systems Division ("MSD"), Machine Tool (Grinding Machines) Division ("MT") and Precision Tool Division ("PT").

In mid–1989, Brown & Sharpe created the Consolidated Parts Department ("CPD") within the Company's MSD Division. The purpose of creating CPD was to help the North Kingstown facility run more efficiently and to help reduce certain overhead costs. CPD consolidated the parts manufacturing for the company's MSD, MT and PT Divisions into one division. Former employees of MSD, MT, and PT divisions joined CPD as part of this consolidation.

By January 1991, it became clear to Brown & Sharpe that the creation of CPD did not achieve the expected reduction in overhead costs. In January or February, 1991, Brown & Sharpe decided to decentralize the work of CPD, making each operating division, MSD, MT, and PT, again responsible for their own production of parts. The MSD Division began to organize what they needed for a scheduled breakaway from the Consolidated Parts Department at the end of March, 1991.

MSD planned to be independent in its production of its parts by April, 1991. For the most part, both MT and PT subcontracted out the bulk of their parts manufacturing after April, 1991.

The "decentralization" of CPD at the end of March of 1991 was also apparently driven by Brown & Sharpe's decision to get out of the heavy manufacturing business. Although some assembly and other work did continue in the final phase of heavy grinding machine assembly, heavy manufacturing did not continue at Brown & Sharpe at Precision Park after the dismantling and permanent shutdown of CPD in March, 1991. Brown & Sharpe entered into an agreement with Jones & Shipman PLC ("Jones & Shipman") on May 31, 1992, to sell to them the right to manufacture the TECHMASTER and HI-TECH surface grinding machine tool product lines, as well as tangible assets, i.e., all jigs, fixtures, tooling, dyes, molds and test equipment, used and essential in the manufacture of the product lines.

The decision to close CPD and "deconsolidate" brought with it layoffs at Brown & Sharpe at Precision Park. From March 11, 1991 to April 9, 1991 at least 38 hourly employees of CPD and at least 20 other employees in the MSD division with positions "related to" CPD were laid off.

Employees were generally given one day notice or less before being laid off. All the matters concerning the deconsolidation and sale to Jones & Shipman were kept secret from the workers employed at Precision Park. When plaintiff Pavao was notified of his immediate layoff on March 27, 1991, he was allegedly surprised and totally unprepared for his immediate unemployment.

Brown & Sharpe alleges that, despite the layoffs, much of the work performed by CPD was performed by other departments or divisions after the deconsolidation. Assembly and shipment of the TECHMASTER and HI-TECH lines of grinding machines continued for many months in the MT Division at Precision Park. As of December 1991, 45 employees at Precision Park were employed on the grinding machine portion of the MT Division. Assembly also continued on turning machines in the MT division. Other work allegedly "deconsolidated" from CPD includes: (1) the continued manufacture of screw machine tools in the MT Division; (2) the rebuilding of existing machine tools in the MT Division; and (3) the sale of repair parts for machine tools in the MT Division.

Report and Recommendation of Magistrate Judge Boudewyns ("Report and Recommendation") (Footnotes omitted.)

The plaintiff class of "aggrieved employees" filed an action under WARN, claiming that Brown & Sharpe engaged in a "plant closing" and "mass layoff" without providing the 60 days notice to workers that is required under WARN. Brown & Sharpe moved for summary judgment, asserting that they ordered neither a "mass layoff" nor a "plant closing" as those terms are defined by WARN, and thus had no duty to provide notice to workers. Plaintiffs objected and filed a cross motion for partial summary judgment, maintaining that the CPD was an "operating unit" under WARN, and that the shutdown of the CPD did indeed constitute a "plant closing" within the meaning of 29 U.S.C. § 2101(a)(2). Magistrate Judge Boudewyns found that Brown & Sharpe did not order a "mass layoff," but did order a "plant closing" within the meaning of WARN, and failed to provide the 60 days notice required by the statute. He recommended that summary judgment by entered in favor of the plaintiffs with regard to the "plant closing" allegation and in favor of the defendant with regard to the "mass layoff" allegation.

Brown & Sharpe objects to the Magistrate Judge's Report and Recommendation on four grounds:

(1) defendant objects to the Magistrate Judge's conclusion that the Consolidated Parts Department at Brown & Sharpe was an "operating unit" within the meaning of WARN;

(2) defendant objects to the Magistrate Judge's conclusion that the Consolidated Parts Department was "shutdown" on or about March 31, 1991 for purposes of WARN, regardless of defendant's asser-

tion that the other departments at Precision Park continued to employ Consolidated Parts Department employees who continued to perform the same work on the same equipment;

(3) defendant objects to the Magistrate Judge's conclusion that the closing of the Consolidated Parts Department "resulted in" an employment loss for over 50 employees within a 30–day period; and

(4) defendant objects to the Magistrate Judge's finding that defendant ordered a 'plant closing' within the meaning of WARN without providing the requisite 60 days notice.

Plaintiffs, in their reply motion, did not object to the Magistrate Judge's recommendation for a grant of summary judgment to the defendant on the WARN "mass layoff" count. They further requested that this court follow Magistrate Judge Boudewyns' recommendation to grant summary judgment to the plaintiffs with regard to the "plant closing" count.

*DISCUSSION:*

 The standard governing the granting of motions for summary judgment is set forth in Fed.R.Civ.P. 56(c), which states that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers or interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

A party moving for summary judgment is entitled to judgment as a matter of law when "there is no genuine issue as to any material fact." The movant has an initial burden of showing "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548,

2553, 91 L.Ed.2d 265 (1986). The non-moving party then must adduce specific facts establishing the existence of at least one issue in dispute that is both "genuine" and "material." A disputed issue is "material" if its resolution necessarily "affect[s] the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). A disputed issue is "genuine" according to First Circuit precedent "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir.1988) quoting *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 248, 106 S.Ct. at 2510.

This court is faced with the task of determining whether, in the instant case, such genuine and material disputed issues of fact exist. I affirm the finding of the Magistrate Judge that no such genuine issues of material fact exist, and that the granting of summary judgment is appropriate as a matter of law.

(1) *Was the CPD an "Operating Unit" within the Meaning of WARN?*

The WARN regulations define an "operating unit" as "an organizationally or operationally distinct product, operation, or specific work function within or across facilities at the single site." 20 C.F.R. § 639.3(j) (1993). When promulgating its final WARN regulations, the Department of Labor ("DOL") explained that "the critical factor in determining what constitutes an operating unit will be the organizational or operational structure of the single site of employment;" throughout the regulations, the DOL emphasized the need to look at the employer's own organizational set up and distinctions in order to determine whether a given group of employees constitute an "operating unit."[1]

---

1. Much of the DOL's discussion of this issue, appearing in the Federal Register, is relevant, and so I quote at length:

(j) Section 639.3(j) Definition of "Facility or Operating Unit"

The regulations adopt common sense definitions of the terms "facility" and "operating unit" within a single site of employment. These terms are important for determining whether a plant closing has occurred. DOL has defined these terms in a manner which attempts to define physically and operationally distinct entities for purposes of determining whether a plant closing, the shutdown of a distinct entity, has occurred.

Several commenters were concerned that the definition of "operating unit" was overly broad and suggested that it be made clear that the term refers to only a "fundamental, distinct or structural organizational segment of the en-

terprise". These commenters were critically (sic) of the use of the word "task" within the definition, arguing that the term is capable of application to activities that are neither fundamental nor distinct. Another commenter thought the definition was too narrow and should be revised to include any distinct operation, department or division of work at a worksite, defined in terms of function or organization. While these two commenters are apparently seeking different results in terms of how operating units would be defined in practice, there appears to be little difference in the definitions they pressed and DOL agrees with both commenters that *only distinct structural or operational entities within a single site of employment are intended to be included as operating units.* DOL agrees that the use of the word "task" might be construed to include specific work assignments within a distinct unit that would not be appropriately included as an operating unit. The final regulations do not use the term "fundamental" in the definition simply because it might create more ambiguities in applying the definition that it would avoid. The definition of operating unit has, therefore, been revised to include these concepts. *The revised definition reads: "an organizationally or operationally distinct product, operation or specific work function."*

Two examples may help to clarify our view of the appropriate limits of the definition. If an automobile manufacturing plant has an assembly line which assembles cars, there may be groups of workers whose job is to put on the doors or the bumpers. The operating unit should be the assembly line, not the groups of workers who perform the task of door or bumper assembly. Similarly, a data processing department may have within it data entry workers, computer programmers, computer maintenance workers and clerical workers. *If the department is clearly a distinct entity in terms of the employer's organizational structure, the data processing department is the appropriate operating unit and the separate task groups are simply a part of that operating unit.* (These examples are merely illustrative and are not intended to create rules applicable to all assembly lines or data processing departments. *There may well be cases in which workers performing different jobs as a part of a larger operation may be sufficiently organizationally or operationally distinct to be defined as a separate operating unit.)*

*The critical factor in determining what constitutes an operating unit will be the organizational or operational structure of the single site of employment. Sources of evidence which will assist in defining separate and distinct units will be applicable collective bargaining agreements, the employer's organizational structure and industry understandings of what constitutes distinct work functions....*

Several different groups of workers in different lines of progression may be organized into a recognized department, like the data process-

ing department discussed above, which would be an operating unit.

In the preamble to the proposed regulations the following example was used to illustrate the operating unit definition: "a 24–hour store eliminating its night shift would not carry out a closing of an operating unit, but the elimination of all warehouse and stock workers on all three shifts would constitute the closing of an operating unit if 50 or more workers were affected." Several commenters disagreed with the example. Some suggested that shifts could constitute operating units depending on the employer's organizational structure and whether the elimination of the shift "results in the closing of the facility during the time the workforce was previously employed." It is possible that there may be situations in which shifts can be operating units of the workers on the shift perform some separate and distinct function from the workers on other shifts. *If, for example, a shift performed only maintenance functions which were not performed on other shifts, if the workers on that shift were in a separate job classification and, possibly, if the workers were recognized in the employer's organizational structure or in applicable collective bargaining agreements as a separate department, the shift could be an operating unit....* As long as the plant continues to operate and no recognized department, operation or major work function has been terminated, the fact of a reduction in hours of plant operation is not the closing of an operating unit.

Other commenters disagreed that all warehouse and stock workers would necessarily constitute an operating unit. They suggested that *whether such workers would be defined as an operating unit would depend on the employer's organization.* If the store were organized by product departments, the departments would be the operating units and the stock workers would be assigned to those units....

Another commenter suggested that the definition of operating unit should exclude "common tasks" such as maintenance, secretarial or housekeeping. Whether maintenance, clerical or housekeeping workers will be considered as an operating unit will depend on how they are organized and how they operate. If there is a separate maintenance or housekeeping department or a central clerical pool, the workers in those units will be in separate operating units. If the workers are assigned to other distinct departments, for example, if different clerical workers work exclusively in several distinct departments, the workers will be considered assigned to those departments.

Another commenter suggested that the definition of operating unit is too broad and proposed that operating units should be defined only as including production processes and should not include support staff. The Department disagrees. *The reason for the use of the term "operating unit" in WARN is to apply the protections of the law to small units of workers in a larger plant when their units are closed. It is not relevant to this purpose whether the*

Brown & Sharpe objects to the Magistrate Judge's conclusion that the CPD is an "operating unit" within the meaning of WARN; rather, Brown & Sharpe maintains that the CPD was an integral part of the MSD. Defendant further maintains that the various divisions of Brown & Sharpe, such as the MSD, MT, and PT, are not distinct operating units, but that they are run as part of a single business enterprise at Precision Park. Defendant, Brown & Sharpe Manufacturing Company's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem.Supp.Mot.Summ.J.") at 16. However, plaintiffs offer the following evidence in support of the notion that the CPD is an "operating unit" for purposes of WARN:

> The Brown & Sharpe manufacturing (*sic*) general managers created a new department, a WARN "operating unit," to save money by centralizing the manufacture of component parts: they moved machines, laid off redundant workers, created a new supervisory hierarchy, and established the new and highly touted "Consolidated Parts Department". The cost accountants gave the Consolidated Parts Department its own "cost center" department number, MS Department No. 5375.

> Upon its creation in mid–1989, the Consolidated Parts Department became responsible for manufacturing all parts for the Machine Tool (Grinding Machines) Division, the Precision Tool Division and the Measuring Systems Division. For all purposes, Brown & Sharpe treated the Consolidated Parts Department like a separate operating unit, with its own separate managers, its own separate budget, and its own separate workforce of part-making specialists. (Massie, 9–10, 51–57). From mid–1989 to its permanent shutdown at the close of the first calendar quarter of 1991, the Consolidated Parts Department stood as the sole and exclusive "operating unit", the sole department, manufacturing parts for Brown & Sharpe's final products.

Memorandum of Points & Authorities in Support of Plaintiffs' Cross Motion for Partial Summary Judgment and Objection to Defendant's Motion for Summary Judgment ("Mem.Supp.Pls.' Mot.Summ.J.") at 11, 12.

■ I agree with the finding of the Magistrate Judge that the CPD is an "operating unit" for purposes of WARN. Most importantly, the CPD had its own managers, its own separate budget (along with a separate "cost center" accounting number), and its own separate workforce. In other words, Brown & Sharpe, in creating the CPD, created a separate organizational and operating structure. As the DOL regulations make clear, such a separate organizational structure, imposed by the employer, is at the heart of the definition of an operating unit for purposes of WARN. An application of the facts of this case to the criteria laid out in WARN and in the DOL regulations makes clear, as a matter of law, that the CPD was a distinct "operating unit" within the meaning of WARN.

**(2) Was the CPD "Shut Down" On or About March 31, 1991?**

> WARN defines a "plant closing" as follows: the term "plant closing" means the permanent or temporary *shutdown* of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shut down results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2101(a)(2) (emphasis added). In order to answer the core question in this case, whether Brown & Sharpe ordered a "plant closing" within the meaning of WARN and was thus obligated to provide sixty days notice to its employees, the language of § 2101(a)(2) first requires me to determine whether there was a "shutdown" of the CPD operating unit at Precision Park.

It is Brown & Sharpe's position that in order for a "shutdown" to occur, there must be an "effective cessation of production or the work performed by a unit." Def.'s Mem. Supp.Mot.Summ.J. at 15. They claim that

---

*workers are production workers or support workers; their job loss and their need for protection is as real in either case.*

Analysis of Final Rule and Comments to Section 639.3(j), 54 Fed.Reg. 16050–51 (1989) (emphasis added).

no such cessation took place. Rather, they argue that

> the Consolidated Parts Department was de-consolidated and that numerous employees of that department were transferred within the MSD Division at Brown & Sharp (sic) and continued to perform the same manufacturing functions on the same equipment. In addition, certain employees from Consolidated Parts Department were moved from MSD to the Machine Tool or MT Division and the Precision Tool or PT Division. These employees continued to perform the same manufacturing functions on the same equipment after March 31, 1991.

Defendant Brown & Sharp (sic) Manufacturing Co.'s Objection to the Report and Recommendation of Magistrate Judge Boudewyns ("Def.'s Objection to Report and Recommendation") at 2. Because CPD employees continued to perform the same manufacturing functions on the same machines, Brown & Sharpe contends that there was not an effective cessation of the work performed by the CPD, and that therefore there was no "shutdown" within the meaning of WARN.

Brown & Sharpe focused on the following language found in the Final Regulations construing WARN issued by the DOL:

> The term "plant closing" means the permanent or temporary shutdown of a "single site of employment," or one or more "facilities or operating units" within a single site of employment, if the shutdown results in an "employment loss" during any 30–day period of the single site of employment for 50 or more employees. *An employment action that results in the effective cessation of production or the work performed by a unit, even if a few employees remain, is a shutdown.*

20 C.F.R. § 639.3(b) (1993) (emphasis added). Brown & Sharpe interprets this emphasized language to mean that a shutdown, by definition, *requires* "the effective cessation of production or the work performed by a unit." Magistrate–Judge Boudewyns reacted to this argument in a way with which I fully agree:

> Brown & Sharpe argues that the final sentence of this passage creates an *exception* to the definition of "shutdown" where

there is a continuation of work in another operational unit. Brown & Sharpe, however, misreads the regulation. The "effective cessation" provision within the regulation only ensures that a plant which produces a minimal quantity of goods after laying off workers will still be viewed as having been "shutdown." It broadens the definition of "shutdown"; it does not narrow it. The undisputed facts of this case demonstrate that CPD was a distinct organizational and production entity that was "shutdown," regardless of whether its work was picked up by other departments.

Report and Recommendation at 10.

The record makes clear that Brown & Sharpe considered the CPD to be an organizationally separate department. Brown & Sharpe planned an organized shutdown of the CPD for March of 1991. In its motion for summary judgment, the defendant argues that the manufacture and sales of heavy machine tools continued after the CPD was closed, and "that there was no shutdown or effective cessation of this activity in the first five months of 1991." Def.'s Mem.Supp.Mot. Summ.J. at 17. However, plaintiffs explain that "[w]hile some assembly and other work did continue in the final phase of heavy grinding machine assembly, it is undisputed, virtually no heavy manufacturing would or could occur at Brown & Sharpe after the dismantling, the permanent shutdown of the Consolidated Parts Department in March 1991." Plaintiffs' Reply to Defendant's Objection to Magistrate's Report and Recommendation Finding a WARN "Plant Closing" and Granting Partial Summary Judgment as to Defendant's WARN Liability ("Pl.'s Reply Def.'s Objection") at 11. Indeed, Brown & Sharpe has explained that when it discontinued the machine tool business, it specifically discontinued production with regard "to the assembly and manufacturing parts for the grinding machines." Massie Deposition Transcript at 124.

■ It is my holding that Brown & Sharpe did "shut down" the CPD on or about March 31, 1991. The evidence is clear that Brown & Sharpe considered the CPD to be a separate organizational unit, and that it planned

and executed a shutdown of that organizational unit. Brown & Sharpe's contention that no shutdown occurred because the manufacture and sale of heavy machine tools continued is hotly contested by the plaintiffs. I need not decide this factual dispute. Regardless of whether some of the CPD's work was picked up by other departments, the CPD was without question a distinct organizational and production entity that was closed by Brown & Sharpe. The defendant's argument that no shutdown occurred because some of the work of the CPD was picked up by other operating units is without merit.

(3) *Did the Closing of the CPD "Result in" Employment Loss for at Least Fifty (50) Employees Within a Thirty (30) Day Period?*

■ Once again, I must turn to the definition of "plant closing" provided by WARN: [T]he term "plant closing" means the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment *during any 30–day period for 50 or more employees including any part-time employees.*

29 U.S.C. § 2101(a)(2) (emphasis added). Thus, in order for a plant closing to occur, 50 or more employees must lose their jobs within a 30–day period. According to the DOL regulations, the employees who lose their jobs due to a shutdown of a facility, operating unit, or single site of employment need not have been employed within the operating unit that was shut down. Rather, the statute "contemplates that both employment losses of employees who work in the facility(s) or operating unit(s) and *those who lose their jobs as the direct result of the shutdown* (s) are to be counted in determining when a plant closing has occurred." Analysis of Final Rule and Comments to Section 639.3(b), 54 Fed.Reg. 16,045 (1989) (emphasis added).

According to Brown & Sharpe, 41 employees affiliated with the CPD were laid off in the 30–day period between March 11, 1991 and April 9, 1991. Fifteen other employees, who were affiliated with the MSD in depart-

ments related to the CPD, were laid off in the same time period. Def.'s Mem.Supp. Mot.Summ.J. at 5, 6. The question is thus whether these fifteen employees lost their jobs as a direct result of the shutdown of the CPD. If so, the number of employees suffering employment loss as a consequence of the closing of the CPD operating unit would pass the requisite number of fifty. Brown & Sharpe maintains that the layoffs both of these employees and of the CPD employees resulted from several other causes and did not result directly from the closing of the CPD. Def.'s Objection to Report and Recommendation at 3. These reasons include the generally poor economic conditions which resulted in a decrease in the Company's business, the decentralization of the CPD and the concomitant decision to subcontract certain parts of the manufacturing at Precision Park, and Brown & Sharpe's sale to Jones & Shipman PLC of the rights to the Techmaster series grinding machines and the Hi–Tech grinding machine. Def.'s Mem.Supp.Mot. Summ.J. at 4.

■ This argument is untenable. Regardless of Brown & Sharpe's reasons for deciding to decentralize and dissolve the CPD, the 41 employees affiliated with the CPD clearly lost their jobs as a result of this dissolution. As the plaintiffs point out, the reasons behind the shutdown of the CPD are not relevant in determining whether the requisite number of employees suffered employment loss as a result of an operating unit's shutdown.

With respect to plant closing occurring within the 30–day time period defined by 29 U.S.C. § 2101(a)(2), PLANT CLOSING "CAUSATION" IS NOT RELEVANT. The "separate and distinct actions and causes" analysis applies only to 90–day plant closing proscribed by 29 U.S.C. § 2102(d), not to terminations of 50 or more employees occurring within one 30–day period.

Pls.' Reply Def.'s Objection at 20. Furthermore, Brown & Sharpe's position is that the additional 15 employees who lost their jobs were not reassigned to other groups and were not kept on due to the general downturn in the economy, the decision to subcon-

tract out certain manufacturing processes and the contract with Jones & Shipman. Once again, their position cannot be maintained. Brown & Sharpe cannot dispute that the event most temporally and causally linked to the employment loss suffered by these fifteen employees is the closing of the CPD. Other events may explain why these employees were not reassigned; however, the initial employment loss is attributable only the shutdown of the CPD. Judge Boudewyns expressed this very clearly:

> there is no real dispute that the immediate, "proximate" cause of the employee layoffs was simply the closing of CPD. All that WARN requires is the shutdown of an operating unit that "results in" an employment loss; whether or not other factors are associated with the decision to "layoff" is beside the point.

Report and Recommendation at 10 (footnote omitted). It is clear, then, that at least 50 employees of Brown & Sharpe lost their jobs within a thirty-day period as a result of the shutdown of the CPD.

(4) *Did Brown & Sharpe Order a "Plant Closing" Within the Meaning of WARN Without Providing the Requisite Sixty (60) Days Notice?*

■ Section 2102(a) of WARN requires the following:

> An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—
>
> > (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee.

29 U.S.C. 2101(a). The parties agree that Brown & Sharpe did not provide their employees with 60 days written notice that the CPD was to be closed. All that remains, then, is to determine whether they were required to do so under WARN; in other words, I must determine whether Brown & Sharpe ordered a plant closing or a mass layoff. The Magistrate Judge agreed with Brown & Sharpe that they did not order a "mass layoff" within the meaning of WARN, and the plaintiffs do not object to this find-

ing. I thus follow Magistrate Judge Boudewyns' recommendation and GRANT defendant's motion for summary judgment with regard to the "mass layoff" allegation. The sole question remaining is whether Brown & Sharpe ordered a "plant closing" within the meaning of WARN.

As I discussed above, WARN provides a clear definition of "plant closing:"

> the term "plant closing" means the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees.

29 U.S.C. 2101(a)(2). If all the elements of this definition are satisfied, then I must find that a plant closing occurred and that Brown & Sharpe failed to meet the notification requirements of WARN.

It is my conclusion that all the elements of this definition are indeed satisfied. First, the CPD was located at Precision Park, undisputedly a "single site of employment," and was an "operating unit" within the meaning of the statute, so that unquestionably "a single site of employment, or one or more facilities or operating units within a single site of employment" is at issue. Second, I have found that the CPD was "shutdown." Finally, at least fifty full-time employees lost their jobs within the 30–day period between March 11, 1991 and April 9, 1991 due to this shutdown. Because Brown & Sharpe was statutorily obligated to provide 60 days notice to these employees and failed to do so, plaintiffs are therefore "aggrieved employees" under 29 U.S.C. § 2104(7) and are entitled to the damages mandated by § 2104. Plaintiffs' motion for summary judgment is GRANTED.

This case is set down for a hearing on Tuesday, March 22, 1994 at 9:30 a.m. to resolve the matters raised in plaintiffs' "prayer for relief" contained in the complaint. The parties will submit pre-hearing briefs on or before March 11, 1994. Furthermore, I order the parties to meet on or before March 11, 1994 in an effort to resolve

the issues contained in the "prayer for relief" by agreement. The parties will notify this Court of the results of this meeting no later than March 15, 1994.

SO ORDERED.