**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 19-2384**

—————————

ROBERT MARK SCHMIDT; JOHN MCDADE; DAVID ARE; STACY DE LA HOZ;
ANDREA HALLOCK; TIMOTHY RADEMACHER; BRUCE MORRIS; GERALD
LEBEL; TOMMY REMBERT; ISAAC GUSMAN, SR.; CRAIG CHUBA; DARRIN
EATON; LAURA KNIGHT; MICHAEL NOVITSKY; MIA FRANKEL; LADEANA
SMITH; TUCKER NEWBERRY; ANTERO LACOT; THUY NGUYEN; KELLY
HOOD; JENIFER MOORHEAD; ROBERT BOERJAN,

        Plaintiffs-Appellees,

     v.

FCI ENTERPRISES LLC,

        Defendant-Appellant,

and

MICHAEL GULINO; DANIEL MUSE; JOHN BRONSON; ROBERT KNIBB; B.
HAGEN SAVILLE,

        Defendants.

—————————

**No. 20-1076**

—————————

ROBERT MARK SCHMIDT; JOHN MCDADE; DAVID ARE; STACY DE LA HOZ;
ANDREA HALLOCK; TIMOTHY RADEMACHER; BRUCE MORRIS; GERALD
LEBEL; TOMMY REMBERT; ISAAC GUSMAN, SR.; CRAIG CHUBA; DARRIN
EATON; LAURA KNIGHT; MICHAEL NOVITSKY; MIA FRANKEL; LADEANA
SMITH; TUCKER NEWBERRY; ANTERO LACOT; THUY NGUYEN; KELLY
HOOD; JENIFER MOORHEAD; ROBERT BOERJAN,

Plaintiffs-Appellees,

v.

FCI ENTERPRISES LLC,

Defendant-Appellant,

and

MICHAEL GULINO; DANIEL MUSE; JOHN BRONSON; ROBERT KNIBB; B. HAGEN SAVILLE,

Defendants.

---

Appeals from the United States District Court for the Eastern District of Virginia at Alexandria. Rossie D. Alston, Jr., District Judge. (1:18-cv-01472-RDA-JFA)

---

Argued: March 10, 2021                  Decided: June 24, 2021

---

Before KING, KEENAN, and RICHARDSON, Circuit Judges.

---

Reversed by published opinion. Judge Richardson wrote the opinion, in which Judge King and Judge Keenan joined.

---

**ARGUED:** Anand Vijay Ramana, VEDDER PRICE, PC, Washington, D.C., for Appellant. Brad D. Weiss, CHARAPP & WEISS, LLP, McLean, Virginia, for Appellees. **ON BRIEF:** Margaret Inomata, VEDDER PRICE, PC, Washington, D.C., for Appellant. Michael G. Charapp, CHARAPP & WEISS, LLP, McLean, Virginia, for Appellees.

RICHARDSON, Circuit Judge:

In October 2018, FCI Enterprises LLC, a government contractor, abruptly shut down, leaving its employees unemployed and unpaid for their work over the preceding three weeks. Twenty-two of those employees sued the company and its owners in federal court, alleging claims under the Worker Adjustment and Retraining Notification ("WARN") Act and the Fair Labor Standards Act. After a trial before an advisory jury, the district court entered judgment on the WARN Act claim for the plaintiffs and on the Fair Labor Standards Act claim for FCI.

FCI appealed the entry of the WARN Act judgment against it. While that appeal was pending, the plaintiffs sought to dismiss the appeal because FCI had failed to post the appeal bond ordered by the district court. But after considering the facial invalidity of the bond and the prejudice to the parties, we decline to exercise our discretion to dismiss the appeal. So we reach the merits of the case and reverse the district court's judgment to the plaintiffs because it erred in determining that FCI was an "employer" covered by the WARN Act. *See* 29 U.S.C. §§ 2101(a)(1)(A), 2102(a).

I. **Background**

A. **FCI's shutdown**

Until its closure in October 2018, FCI Enterprises was "a government contractor providing financial, management, engineering, cybersecurity, and IT solutions and services throughout the United States." J.A. 36; *see* J.A. 143–44. The company was headquartered in Chantilly, Virginia, which was its only physical location. But many FCI employees

3

worked at various government client sites, including Fort Mead in Maryland and Fort Sam Houston in Texas.

In July 2016, Robert Knibb, B. Hagan Saville, and John Bronson, three of the individual defendants in this case, bought FCI with the aid of a two-year $10 million loan from BB&T. When the loan came due in 2018, BB&T and FCI began negotiating for an extension. They eventually agreed to extend the loan until October 4, 2018. During the negotiation period, FCI's Chief Financial Officer, Daniel Muse, reached out to other lenders, but none were interested in doing business with FCI because of its financial instability. Ultimately, negotiations with BB&T for a further extension failed. So on the evening of October 4, BB&T took all of the money in FCI's accounts, about $1.8 million. This left FCI unable to make payroll the next morning.

On the morning of Friday, October 5, Muse emailed all FCI employees informing them that BB&T had "cut off [FCI's] access to all funds in its bank accounts" and requiring them "to cease all work, effective immediately." J.A. 2058. Over the weekend, FCI employees received several more updates from the company's officers. They were finally notified on Monday, October 8 that they had been "officially laid off as of close of business" on Friday, October 5, 2018. J.A. 2243–44.

**B.    The proceedings below**

The next month, twenty-two of the terminated employees sued FCI and its five officers and owners, alleging violations of the WARN Act, 29 U.S.C. §§ 2101–2109, and the federal Fair Labor Standards Act, 29 U.S.C. §§ 201–219. The district court rejected FCI's motion to dismiss for failure to state a claim. *Schmidt v. FCI Enters. LLC*, No. 1:18-

4

cv-1472, 2019 WL 8888102, at *3 (E.D. Va. Jan. 22, 2019). After that ruling, FCI answered the complaint, asserting various defenses including that it did not fall within the WARN Act's definition of "employer." J.A. 143–66; *see* 29 U.S.C. § 2101(a)(1)(A).

The case eventually went to trial. The jury reached a mandatory verdict for FCI on the Fair Labor Standards Act claim and an advisory verdict for the plaintiffs on the WARN Act claim. Because the WARN Act verdict was advisory, the district court issued a Rule 52 memorandum on that claim that awarded judgment to the plaintiffs and assessed the damages owed to each, except for one who had left FCI the day before its shutdown. *Schmidt v. FCI Enters. LLC*, No. 1:18-cv-01472 (RDA/JFA), 2019 WL 5748952, at *5–6 (E.D. Va. Nov. 5, 2019). FCI then filed a motion for judgment as a matter of law under Rule 50(b). After a hearing, the district court denied the motion, which it construed as a motion filed under Rule 52(a), and entered final judgment. *See Schmidt v. FCI Enters. LLC*, No. 1:18-cv-01472 (RDA/JFA), 2020 WL 2748500, at *1, 9 (E.D. Va. Jan. 3, 2020). FCI timely appealed. We have jurisdiction. *See* 28 U.S.C. § 1291.

### C. The appeal bond

After FCI appealed, the plaintiffs filed a motion for bond. The court ordered FCI to post an appeal bond that covered the judgment and the costs of appeal, explaining that it was "concerned with respect to the significant dispute as to whether FCI is truly insolvent, and that the Plaintiffs will not have adequate security that their costs will be paid if Defendants' appeal is denied." *Schmidt v. FCI Enters. LLC*, No. 1:18-cv-01472

5

(RDA/JFA), 2020 WL 2748499, at \*4 (E.D. Va. Feb. 3, 2020).[1] FCI did not pay the bond, so the plaintiffs moved to dismiss the appeal in this court.

## II. Discussion

### A. Appeal bond

Federal Rule of Appellate Procedure 7 permits a district court to "require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7. The district court purported to do so, and FCI failed to post the bond. Whether we should dismiss FCI's appeal for failure to post the bond is a matter within our discretion. *See* Fed. R. App. P. 3(a)(2) ("An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal."); *see also Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950, 961 (9th Cir. 2007).

We decline to exercise that discretion to dismiss this appeal. Instrumental to our decision is the fact that the district court imposed a facially invalid appeal bond. The appeal bond included the amount of the judgment. *See Schmidt*, 2020 WL 2748499, at \*5. But Rule 7 expressly permits an appeal bond to cover only the appellees' "costs on appeal." Fed. R. App. P. 7. We have no precedent discussing the meaning of "costs on appeal," but

---

[1] The dispute about FCI's alleged insolvency centers on the plaintiffs' argument that FCI's owners had squirreled away more than $1 million that should have been among the company's assets at the time of its closing. Because the district court did not resolve that dispute, we do not wade into that thicket. But even if that money properly belonged to the company at the time of the shutdown, FCI continues to owe $1.5 million to BB&T.

our sister circuits have found that such costs must be related to the appeal and are the costs a "successful appellate litigant can recover pursuant to a specific rule or statute." *Tennille v. W. Union Co.*, 774 F.3d 1249, 1254–55 (10th Cir. 2014) (collecting cases). Although cases from other circuits go to great lengths to determine what appeal costs may be part of the bond amount, none conclude that the amount of judgment is one of those costs. *See, e.g.*, *id.* at 1254 n.3 ("[W]hereas a Rule 7 appeal bond is restricted to costs on appeal, a supersedeas bond usually covers the full amount of the money judgment." (citation omitted)); *Adsani v. Miller*, 139 F.3d 67, 70 n.2 (2d Cir. 1998) (suggesting that a supersedeas bond retrospectively covers the underlying judgment while the Rule 7 bond prospectively relates to the appeal's expenses).

Perhaps the district court intended to order a supersedeas bond to cover the amount of judgment and an appeal bond to cover the plaintiffs' costs on appeal. *See* Fed. R. Civ. P. 62(b) ("At any time after judgment is entered, a party may obtain a stay by providing a bond or other security."). But the court's express language forecloses that reading. *See, e.g.*, *Schmidt*, 2020 WL 2748499, at *3 ("The Court finds that an appeal bond is warranted that covers costs on appeal as well as the full amount of the judgment."). And the district court explicitly denied the defendants' requested stay under Rule 62, so Rule 62(b) could not be the basis for a supersedeas bond here. *Id.* at *4.

The district court's order also fails to specify the amount of "costs on appeal" that the bond covers. And without some articulation of the amount owed so that FCI knows what is due to the court, we hesitate to impose the harsh sanction of dismissal. *Cf. United States v. McMahon*, 104 F.3d 638, 642 (4th Cir. 1997) ("To support a conviction of

7

criminal contempt for violation of a court order, it must be proved beyond a reasonable doubt, that a person willfully, contumaciously, intentionally, with a wrongful state of mind, violated a decree which was *definite, clear, specific, and left no doubt or uncertainty* in the minds of those to whom it was addressed." (emphasis added) (quoting *Richmond Black Police Officers Ass'n v. City of Richmond*, 548 F.2d 123, 129 (4th Cir. 1977))).

Maybe the district court intended to grant the plaintiffs' motion for bond in full, thus incorporating by reference the exact amount they requested. The plaintiffs had moved for "an appeal bond for the full amount of costs and attorneys' fees ordered by this Court pursuant to Plaintiffs' Motion for Attorneys' Fees and Costs," J.A. 792, which totaled $319,249.00 in attorneys' fees and $34,060.03 in costs, J.A. 831. But even if the bond incorporated those amounts by reference, it was still invalid. Already-accrued attorneys' fees and costs are not "costs on appeal" and therefore cannot be part of a Rule 7 bond. Fed. R. App. P. 7.

Despite the apparent invalidity of the appeal bond, FCI complicated our situation by failing to appeal the entry of the bond directly, which it was entitled—but not required—to do. It simply declined to post the bond, only raising arguments about its validity after the plaintiffs moved to dismiss the appeal in light of its failure to pay. And we would naturally think that "[a] litigant cannot ignore an order setting an appeal bond without consequences to [its] appeal," perhaps even if the bond was improperly imposed. *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812, 818 (6th Cir. 2004). While we understand the futility of requesting that the district court reconsider its appeal-bond ruling under these

8

circumstances, we cannot say that the same was true of seeking our review at an earlier juncture. FCI should have done so and risked having its appeal dismissed.

But not only was the bond facially invalid, FCI's failure to comply with the bond did little to prejudice the plaintiffs. *See id.* (considering the prejudice to the parties); *accord Azizian*, 499 F.3d at 962. FCI has repeatedly proffered evidence showing that its bank accounts are overdrawn, empty, or nearly so. *See, e.g.*, J.A. 809–10 (showing only $272.30 in FCI's bank accounts in January 2020); Decl. of Daniel J. Muse, Appellant FCI Enterprises LLC's Amended Opposition to Appellees' Motion to Dismiss Appeal, ex. A–B (showing one account overdrawn by $925.47 and one account with $41.54 as of February 2020). And it has submitted a declaration that three bonding companies refused to post FCI's bond unless the company secured the amount with either an irrevocable letter of credit or cash equivalent to or greater than the amount of the bond, which it did not have. *See In re Cardizem CD Antitrust Litig.*, 391 F.3d at 818 (considering the "justification for the failure to post the bond"); *accord Azizian*, 499 F.3d at 961.

The plaintiffs (perhaps rightly) fear that they will be unable to recover any of the compensation they may be due if they prevail on appeal because of FCI's insolvency. But on this record, that can hardly amount to prejudice. The plaintiffs knew of FCI's insolvency even before filing this lawsuit. In fact, they have been woefully aware of FCI's insolvency since October 4, 2018, the day that the company was unable to issue their last paychecks. From that perspective, the plaintiffs' ability to collect what they are due should they succeed on appeal is not lessened by FCI's failure to pay the appeal bond.

9

In contrast, FCI would be prejudiced from dismissing the appeal given the "legitimate questions" on appeal, one of which we ultimately resolve in its favor. *See In re Cardizem CD Antitrust Litig.*, 391 F.3d at 818 (considering the "merits of the underlying appeal"); *accord Azizian*, 499 F.3d at 961. And we are hesitant to foreclose a meritorious appeal based on the appellant's alleged inability to pay. *Cf. Lindsey v. Normet*, 405 U.S. 56, 79 (1972) (finding an equal-protection-clause violation when indigent appellants must pay double bond to bring certain eviction appeals).

So based on the bond's facial invalidity and the potential prejudice to FCI, we decline to exercise our discretion to dismiss this appeal because of FCI's failure to pay. We therefore proceed to the merits.

**B.    WARN Act "employer"**

In 1988, Congress passed the WARN Act, which requires certain employers to provide notice to their employees of "sudden, significant employment loss" so that they "could seek alternative employment and their communities could prepare for the economic disruption of a mass layoff." *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808 (4th Cir. 2007) (first citing *Bader v. N. Line Layers, Inc.*, 503 F.3d 813 (9th Cir. 2007); and then citing 20 C.F.R. § 639.1(a)). Specifically, the Act requires that an "employer . . . not order a plant closing . . . until the end of a 60-day period after [it] serves written notice of such an order." 29 U.S.C. § 2102(a). The Act is supplemented by extensive Department of Labor regulations, *see* 29 U.S.C. § 2107(a), which we must give "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute," *Chevron, U.S.A., Inc.*

10

*v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *accord Meson*, 507 F.3d at 808–09.

The WARN Act only applies to "employer[s]," *see* § 2102(a), which it defines as "any business enterprise that employs . . . 100 or more employees, excluding part-time employees," *id.* § 2101(a)(1)(A).[2] The definition of "part-time employees" is anything but intuitive, encompassing individuals "employed for an average of fewer than 20 hours per week or who ha[ve] been employed for fewer than 6 of the 12 months preceding the date on which notice is required." *Id.* § 2101(a)(8). Whether FCI is a covered "employer" within these definitions is a mixed question of law and fact, "which we review by inspecting factual findings for clear error and examining de novo the legal conclusions derived from those facts." *Meson*, 507 F.3d at 806.

We decide whether a business qualifies as a covered "employer" as of "the date the first notice is required to be given." 20 C.F.R. § 639.5(a)(2).[3] Under the Act, FCI had to give its employees notice of their impending terminations on August 6, 2018, sixty days before the shutdown on October 5, 2018. *See* § 2102(a). So August 6 is the relevant date

---

[2] The plaintiffs do not rely on the alternative definition of "employer": "any business enterprise that employs . . . 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)," 29 U.S.C. § 2101(a)(1)(B). It is not in their complaint, trial documents, or their opening brief. The jury instructions did not include the alternative definition, and the district court did not consider it. So we decline to consider whether the plaintiffs would prevail under that definition.

[3] If the number of individuals employed on that date is "clearly unrepresentative of the ordinary or average employment level, then a more representative number can be used to determine coverage." 20 C.F.R. § 639.5(a)(2). But neither party nor the district court contends that a different date should be used.

11

on which the district court should have counted the number of FCI employees. But the district court incorrectly chose February 9, 2018, as the relevant date. *See Schmidt*, 2019 WL 5748952, at *3. This was clear legal error.

In the face of such an error, we would ordinarily remand to the district court to make a new factual finding. *Maine v. Taylor*, 477 U.S. 131, 144–45 (1986); *accord Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 575–76 (4th Cir. 1995). But in the rare case in which the district court's factual "findings are infirm because of an erroneous view of the law" and "the record permits only one resolution of the factual issue," we may resolve the question ourselves. *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982); *accord United States v. Watson*, 793 F.3d 416, 429 (4th Cir. 2015); *Williams v. Poulos*, 11 F.3d 271, 280–81 (1st Cir. 1993). That is the situation here. The record before the district court permits only one answer to whether FCI is a covered "employer" under the Act: it is not.

Whatever the precise number, it is indisputable based on the evidence presented at trial that FCI employed fewer than 100 employees, excluding "part-time" employees, on August 6, 2018. Our computation begins with the Paycom report FCI generated after the start of litigation that purports to list all employees who were terminated as a result of the shutdown on October 5, 2018. *See* J.A. 2051–56. There are 130 employees on that list. *See id.*; *see also* J.A. 1652 (testimony confirming this number). But only those who were hired on or before February 6, 2018, and were still employed on August 6, 2018, count.

*See* 29 U.S.C. § 2101(a)(8).[4]  So we must exclude 48 of them who were hired after February 6, 2018, because they had been employed for fewer than six months and therefore would be considered "part-time" as of August 6, 2018.  *See* J.A. 2051–56.[5]  That leaves us with 82 employees.

But the Paycom report omits some employees who should count toward our total. The "missing" employees are those who were hired on or before February 6, 2018 (six months before notice should have been given), worked for FCI on August 6, 2018, and left the company between August 6 and FCI's mass termination on October 5.  *See* J.A. 1757.

The plaintiffs' attorney questioned Muse, FCI's Chief Financial Officer, at trial about numerous workers who were not included in the Paycom report.  *See* J.A. 1758–70. But only fifteen of those names meet the relevant criteria and Muse only confirmed the name and dates of employment of eight of those fifteen employees.  He explained that he was not familiar with the other seven.  *See, e.g.*, J.A. 1768 ("I don't recognize that name."); J.A. 1770 ("I don't know that person either.").  And we have not found independent

---

[4] It is possible, although unlikely, that someone could count toward the requisite 100 employees without being employed on February 6, 2018.  That is because a part-time employee is one that, among other things, was "employed for fewer than *6 of the 12 months* preceding the date on which notice is required."  29 U.S.C. § 2101(a)(8) (emphasis added). But those six months need not be continuous.  So a person could have been employed for some amount of time between August 6, 2017 (twelve months before August 6, 2017), and February 6, 2018, terminated before February 6, 2018, and rehired after February 6, 2018. If that person were employed by FCI for more than six months in the one-year period, she should be counted.  But neither party raises this argument, and we have not independently found any such person in the record.

[5] One employee listed in the report was scheduled to begin work several days after the shutdown, on October 15, 2018.  *See* J.A. 2055.  We have included that person in the 48 who must be subtracted from the total number on the list.

13

evidence in the record that otherwise establishes the hiring and termination dates of those seven employees. *See* J.A. 2268–86 (spreadsheet listing FCI employees does not include the termination dates of the seven employees). So adding the 8 confirmed employees to our prior total, we arrive at 90.

The last employee we identified as part of our count is Plaintiff Mia Frankel. Frankel worked at FCI from December 2009 until October 4, 2018, the day before the mass termination. She was not listed on the Paycom report, *see* J.A. 2051–56, and was not one of the "missing" individuals Muse was questioned about during trial, *see* J.A. 1758–70.[6] So with that addition, we reach 91 employees—9 short of the 100 required to qualify for WARN Act coverage.

The plaintiffs, perhaps realizing that the data does not favor them, offer two other ways to reach the 100-employee threshold. First, they rely on a "company overview" PowerPoint slide used during a presentation in August 2018 and admitted into evidence at trial. *See* J.A. 1652, 2194, 2196. That slide reflected that FCI employed 150 individuals. J.A. 2196. But, as Muse testified at trial, that number was not precise: "At some point in

---

[6] We also cross referenced a floor plan of FCI headquarters that purports to show the office locations of some employees working on October 5th. *See* J.A. 2057; *see also* J.A. 735 (witness who authenticated the floor-plan exhibit narrating changes to the floor plan). Most of the names mentioned in connection with the floor plan were listed in the Paycom report. Two were not. One was Chief Executive Officer Michael Gulino, but he does not count because he was not hired until May 1, 2018. J.A. 1561. The second, Dan Doe, is possibly an independent contractor, but in any event, was terminated before August 6. J.A. 1765.

A witness explained that two other people had offices in that area but she could not remember their names. J.A. 736–37. But we cannot include those people in our count because we have no way of verifying when they were hired and terminated.

August, it was probably around 150, sort of round numbers, but that we had lost a contract in August and the business had shrunk subsequently to that." J.A. 1652. And even if we were to credit that estimate, no evidence specifies the precise date in August on which that number was calculated or clarifies whether any of those employees were "part-time," *i.e.*, had worked for the company for fewer than six of the preceding twelve months. So the PowerPoint slide does not support a different resolution of this question.

Second, the plaintiffs point to a chart listing FCI employees that was prepared by a former employee, Plaintiff Michael Novitsky, in March 2018. *See* J.A. 2264–86. Using the data from that chart, Novitsky testified that FCI had employed 148 individuals in January 2018 and 142 employees in February and March 2018. J.A. 1831; *see also* J.A. 2265 (chart). He also testified that only three of those people were "part-time employees" but did not define that term. J.A. 1831. Strangely, the chart lists 142 total employees for every month from February 2018 to December 2018 with no new hires or terminations. Plaintiffs use this chart to argue that FCI met the 100-employee threshold in August 2018. But Novitsky admitted that he had not updated the chart after he created it in March 2018. J.A. 1833. That concession is undisputed. And it reflects common sense: the number of employees in October, November, and December 2018 remained undisturbed despite the termination of the entire workforce in October of that year. The chart is also contradicted by the Paycom report and Muse's testimony that reflect new hires and terminations during this period which are not represented in the chart. But even if the chart presented accurate data for August 2018, it suffers the same flaw as the PowerPoint slide: it does not purport to count only those employees who were not "part time" as defined in the WARN Act.

15

So the record permits only one resolution of the issue before us. *See Pullman-Standard*, 456 U.S. at 292. Whatever the precise number, FCI employed fewer than 100 employees on August 6, 2018. It is therefore not an "employer" whose shutdown activities are covered by the WARN Act. The district court erred in concluding otherwise.[7]

\* \* \*

No matter who bears the fault for FCI's sudden shutdown and the termination of its employees, the plaintiffs cannot find relief within the ambit of the WARN Act. We reach the merits of that claim after declining to exercise our discretion to dismiss the appeal for FCI's failure to post the appeal bond. And we find that the record before the district court reflects that FCI did not have enough employees to be considered an "employer" within the meaning of the Act. So the judgment of the district court on the WARN Act claim is

REVERSED.

---

[7] Because we reverse the district court on this ground, we decline to address whether FCI's Chantilly headquarters were properly considered the "single site of employment" of the terminated employees, 29 U.S.C. § 2101(a)(2), and whether the district court properly rejected FCI's faltering-business defense, *see id.* § 2102(b)(1).