21-833-cv
*Roberts v. Genting*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2021

(Argued: May 11, 2022    Decided: May 15, 2023)

Docket No. 21-833-cv

———————

GERALD ROBERTS, STEPHEN JOHNSON, CHRISTOPHER MCLEOD, DAVID SHAW, ANITA JOHNSON, CHRISTOPHER HUMPHRIES, JEFFREY WILKINS, LATANYA MARTIN-RICE, LAURA SANCHEZ, LUCY MUNOZ, NATALIO HERRERA, RADIKA KANHAI, ROGER SIERRA, YOON SUNG KIM, CHRISTINA LAMBRU, IRENE TSOROROS, MARIA DIAZ, CYNTHIA DURAN, JASPER JONES, ALLEN CHERFILS, LISA LUNDSREN, TERESA AREVALO, SYED A. HAQUE, AHMED TALHA, OLIE AHMED, JAMAL AHMED, SORWAR HUSSAIN, LUZ OSPINA, JOHNNY MURILLO, THOMAS DORGAN, SENECA SCOTT, ERIC LEE, WILLIAM BOONE, MARLENNI MINAYA, ISABEL PENA, CELESTE BROWN-POLITE, DWIGHT CURRY, RAWLO BENFIELD, JOSEPH BROWN, SANDRA MILENA-MARTINEZ, MARINO CANO, ABIGAIL APPIAH-OTCHERE, DALIA TOPPIN, ANA MOREIRA, BETSABE TORRES, LORNA BENT, OSMOND WALKER, CONRAD HALL, VISHWANI SUKHRAM, ANNE GRONATA, BRUCE SMITH, NESTOR AMAYA, GUIDO ANTONIO RODRIGUEZ, WILLIE BALLENTINE, PETER VONTAS, FELIX GONZALEZ, MICHELLE LATIMER, VARISE WALLER, SOOKIA FREEMAN, CAMARCA FLOWERS, ANTONIO SALCEDO, JOEVEN CORTEZ, and JUDITH ALLEN on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

GENTING NEW YORK LLC, D/B/A RESORTS WORLD CASINO NEW YORK CITY,

*Defendant-Appellee.*\*

———————

\*    The Clerk of Court is respectfully directed to amend the official caption to conform to the above.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Before:

NEWMAN, CHIN, and SULLIVAN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Glasser, *J.*) denying plaintiffs-appellants' motion for summary judgment, granting defendant-appellee's cross-motion for summary judgment, and dismissing plaintiffs-appellants' amended complaint. Without providing advance notice, defendant-appellee closed a buffet restaurant within its casino, simultaneously laying off 177 employees, including plaintiffs-appellants. The district court held the buffet was not an "operating unit" or a "single site of employment" for the purpose of federal and state laws that require employers to give employees advance warning when a site or unit is to be closed. On appeal, plaintiffs-appellants contend that the district court erred in granting summary judgment because a reasonable finder of fact could have determined the buffet was an operating unit or single site of employment.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judge Sullivan dissents in a separate opinion.

JESSE C. ROSE, Phillips & Associates PLLC, New York, New York, *for Plaintiffs-Appellants.*

DANA M. SUSMAN (Jonathan M. Sabin, *on the brief*), Kane Kessler, P.C., New York, New York, *for Defendant-Appellee.*

Brian M. Boynton, Principal Deputy Assistant Attorney General, Michael S. Raab, Catherine M. Padhi, Attorneys, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., *for Amicus Curiae United States of America.*

CHIN, *Circuit Judge*:

On January 6, 2014, defendant-appellee Genting New York LLC, d/b/a Resorts World Casino New York City ("Genting"), closed the Aqueduct Buffet (the "Buffet"), a restaurant located inside the Resorts World Casino (the "Casino") where plaintiffs-appellants ("Plaintiffs") worked. Genting gave Plaintiffs no notice of the closure, which took effect the same day and resulted in 177 employees being laid off. The next week, Plaintiffs filed a putative class action against Genting, alleging that its failure to provide notice violated the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.*, and New York Labor Law § 860 *et seq.* (the "New York WARN Act")

(together, the "WARN Acts").  On cross-motions for summary judgment, the district court denied Plaintiffs' motion and granted Genting's.  The court concluded that there was no genuine issue of material fact as to whether the Buffet was an "operating unit" or "single site of employment" whose closure would trigger the WARN Acts' notification requirements.  It held, as a matter of law, that the Buffet was neither an operating unit nor a single site of employment.

On appeal, Plaintiffs argue that the district court erred in granting summary judgment for Genting because, they claim, a reasonable jury could only conclude that the Buffet was either an operating unit or a single site of employment under the WARN Acts.  After hearing oral argument, we solicited the views of the U.S. Department of Labor (the "DOL") on the scope and meaning of the terms "operating unit" and "organizationally or operationally distinct" as used in the federal WARN Act and its associated regulations.  Submitting an *amicus curiae* brief, the DOL emphasized that determining whether an operating unit exists "requires a fact-intensive analysis."  Amicus Br. at 2, 6.  The DOL took the position that, on a "somewhat mixed" record, the district court erred in concluding as a matter of law that the Buffet was not an operating unit.  *Id.* at 8.

4

Genting argues that the district court did not err and, moreover, that we should reject the bulk of the DOL's brief as an improper usurpation of the Court's authority.

For the reasons set forth below, we AFFIRM in part, VACATE in part, and REMAND.

## BACKGROUND

**A.    *The Facts*[1]**

**1.    *The Casino and the Buffet***

The Buffet was located inside the Casino, which Genting owned in Queens, New York.  When the Casino opened in 2011, it offered guests "over 30 food and beverage options."  J. App'x at 1241.  Among them were outlets in a food court, service and retail bars, two gourmet restaurants, a fast food venue, a coffee shop, and the Buffet.  The Casino was also responsible for food and beverage service at the New York Racing Association (the "NYRA"), which was "adjacent to and connected to" the Casino and housed another buffet, called

---

[1]    Because the district court granted summary judgment in favor of Genting and dismissed the amended complaint, we examine the record in the light most favorable to Plaintiffs.  To the extent Plaintiffs also seek review of the district court's denial of their motion for summary judgment, we note below the existence of facts supporting Genting's position.

Equestrius. *Id.* at 248-49. All the food outlets at the Casino and the NYRA, including the Buffet, operated under the auspices of the Casino's food and beverage ("F&B") department.

Genting management regarded the Buffet, like the Casino's other food and beverage offerings, as an "amenity" for Casino patrons rather than a destination or product in its own right. *Id.* at 281. Genting advertised the Buffet in brochures encouraging prospective guests to patronize the Casino. Those wishing to eat at the Buffet typically paid an entrance fee, although the Casino sometimes offered discounted or complimentary admission. Unlike the Casino's other food outlets, the Buffet operated on an all-you-can-eat basis.

A wide selection of hot and cold foods was available at the Buffet, including beef stew, chicken breasts, pizza, sushi, and salads. Generally, hot items were prepared in the Buffet's own kitchen, whereas refrigerated items and refrigerated ingredients for hot foods were brought to the Buffet from the Casino's centralized cold kitchen (known in industry parlance as the "*garde manger*"). *Id.* at 228. The Buffet used the same culinary manual as the Casino's other food outlets, although the manual designated which recipes were used at

which outlets. The Buffet did not purchase its own food but instead ordered ingredients from the Casino's centralized warehouse.

As these facts indicate, the Buffet was dependent on the Casino for certain centralized services. In addition to the *garde manger* and warehouse, the Casino's human resources department hired employees for the Buffet, trained them, and worked with a vendor to process payroll. A centralized accounting and finance department recorded and reported financial information for costs incurred by the F&B department; the Buffet had a designated cost center in the Casino's accounting system, as did some other food outlets. Staff from the maintenance and engineering departments repaired defective equipment in the Buffet. Whenever an unsanitary "incident" occurred in the Buffet, the Casino's environmental services department would provide specialized cleaning services. *Id*. at 257. Stewards who performed ordinary cleaning duties rotated through all the food outlets. The stewards reported to managers outside the Buffet, and the Casino allocated their wages to the stewards' cost center.

Food and beverage workers were assigned to the Buffet only after they had been hired by the Casino. Once assigned to the Buffet or another F&B outlet, an employee would typically receive a schedule to work there for one or

7

more six-month cycles. The Casino charged the wages of employees assigned to the Buffet to the Buffet's cost center. Employees assigned to the Buffet were sometimes sporadically asked (and occasionally volunteered) to work in other locations, such as when the Casino hosted special events or when workers were needed to cover for absentees as a result of inclement weather, sickness, or vacation time. *Id.* at 97, 277; *see also* 353 (laid-off employee testifying he worked predominantly in the Buffet but was assigned to other outlets' kitchens from time to time).

The Buffet had its own managers, although they did not report directly to Casino officers such as the chief operating officer or president. The managers occupied positions within two reporting lines. The "Buffet Manager," who oversaw the front-of-house area where employees interacted with patrons, reported to the assistant director of the F&B department, who, in turn, reported to the F&B department's vice president. Separately, the "Executive Sous Chef-Buffet" managed the Buffet's kitchen and reported to the assistant executive chef, who, in turn, reported to the executive chef. The executive chef, who oversaw all the Casino's food outlets and was responsible for determining what food options would be offered at each, reported to the director of F&B, who reported to the

8

vice president of F&B. Within the Buffet, both the Buffet Manager and the Executive Sous Chef set the work schedules of employees and, along with shift managers who reported to them, approved proposed changes. The Casino's other food outlets had similar management structures.

Non-management employees throughout the Casino belonged to a union, the New York Hotel and Motel Trades Council, AFL-CIO (the "Union"), which began organizing the Casino's workers before it opened its doors. Plaintiffs became members of the Union in December 2011, after the Union and Casino entered into a card check and neutrality agreement and after the Union was certified as the exclusive bargaining representative for non-management employees of the Casino.

Relations between the Union and the Casino were not without tension. Following a roughly two-year organizing effort, an Interest Arbitration Award in October 2013 settled the terms of a collective bargaining agreement (the "CBA") between the Union and the Casino. The CBA provided non-management employees substantially higher pay and more generous benefits than they had previously enjoyed. It described the job classifications, compensation structure, policies, and terms of employment for non-management

employees. "[T]he salary structure, job duties, and terms and conditions of employment were identical for each job classification, regardless of which food and beverage outlet an employee was assigned to at any given time." *Id.* at 1254-55. The CBA also required that layoffs "be governed by classification seniority in a department." *Id.* at 392.

## 2. *The Buffet's Closure*

On January 6, 2014, less than three months after the Interest Arbitration Award took effect, Genting closed the Buffet. Genting laid off 177 employees, including cooks, food servers, food runners, bussers, hosts, cashiers, warehousemen, and stewards who "work[ed] in the buffet department or in roles supporting the buffet." *Id.* at 793. Genting notified affected employees of their layoffs through letters dated the same day.[2] The Casino's employee rosters listed

---

[2] Ryan Eller, president of the Casino, testified that employees were given no advance notice of the layoffs because the Casino wanted to avoid the "unreasonable risk" of "allow[ing] them to have access to the facility," which is highly regulated by the state gaming commission. *Id.* at 130. In addition, Eller testified, the affected employees' "pay would continue for the period they would otherwise work under the CBA based on the notification as required." *Id.* Plaintiffs and Genting dispute, however, whether January 6, 2014, was the first day that Plaintiffs could have learned about the layoffs. Between November 2013 and January 2014, the Casino negotiated some of the terms of the layoffs with representatives of Plaintiffs' Union, and Genting contends that "the Union had knowledge of and had previously approved the layoffs, the timing of the layoffs, the timing and content of notices provided, among other things." *Id.* at 166.

10

approximately 100 of the discharged workers as belonging to "Buffet" or "Buffet-Culinary" as their "Home Department," while the other employees were assigned to departments such as "Cold Kitchen/Garde Mange [*sic*]" or "Stewarding." *Id.* at 850-52.[3] A document Genting gave to affected workers explained that the layoffs impacted "[o]nly those departments directly related to the operation of the [B]uffet" and "no other departments outside of Food and Beverage." *Id.* at 794.

After the Casino closed the Buffet, the Union filed CBA-based grievances concerning the closure with the same Office of the Impartial Chairperson that had issued the 2013 Interest Arbitration Award. The Union argued that the Casino ignored the clear language of the CBA by conducting "out of seniority layoffs" of certain F&B employees. *Id.* at 393. Because the Union asserted that each food outlet was not a separate department for the purposes of classification seniority, it argued that employees with less seniority who worked outside the Buffet should have been laid off before employees with greater seniority who worked in the Buffet. Genting, seeking a decision dismissing the

---

[3]     The parties dispute the import of these labels. Plaintiffs assert that "all employees working in the Aqueduct Buffet worked in that location a vast majority of the time." *Id.* at 1246. Genting responds that "some of the affected employees were working in the Aqueduct Buffet, while others were working in other outlets/departments of Resorts World, such as the Stewarding department, the Cold Kitchen and the Warehouse." *Id.*

grievances in their entirety, argued that, for purposes of the CBA, the Buffet was its own department.

On November 24, 2015, the Office of the Impartial Chairperson issued a decision in favor of the Union. The Impartial Chairperson found that the term "department," as used in the CBA, means the "food and beverage department," and that "where jobs from one outlet to another are, in the overwhelming main, vastly similar or fungible so as to require little or no training, classification seniority must be given effect" across outlets. *Id.* at 399.

**B.** *Procedural History*

On January 14, 2014, Plaintiffs filed this putative class action. Their amended complaint alleges that Genting violated the WARN Acts when it failed to provide them with notice before closing the Buffet because the Buffet was "a site of employment, or one or more facilities or operating units within a single site of employment." *Id.* at 32-33. On February 16, 2016, following discovery, Plaintiffs and Genting filed cross-motions for summary judgment.

On March 12, 2021, the district court denied Plaintiffs' motion and granted Genting's motion, dismissing Plaintiffs' amended complaint. *Roberts v. Genting New York LLC*, No. 14-CV-257, 2021 WL 950055 (E.D.N.Y. Mar. 12, 2021).

The court concluded that Genting had "sufficiently proven" the Buffet was not an "operating unit" under the WARN Acts. *Id.* at *10.[4] The court determined there were no issues of fact preventing it from reaching this conclusion because record evidence "sufficiently prove[d]" the Buffet was neither "operationally separate and distinct," nor "organizationally separate and distinct," from the rest of the Casino. *Id.* at *10, *4, *6.

This appeal followed. After oral argument, because "[w]e ha[d] not previously considered the scope of 'operating unit' under 29 U.S.C. § 2101(a)(2) or the meaning of 'organizationally or operationally distinct' under 20 C.F.R. § 639.3(j)," we invited the DOL to submit any views it wished to share. ECF Dkt. No. 87 at 2. We received the DOL's response in the form of an *amicus curiae* brief on July 25, 2022, and Genting, after we granted leave to respond, submitted a letter brief in reply on August 23, 2022.

## DISCUSSION

**A.** *Standard of Review*

"We review a district court's grant of summary judgment *de novo* where . . . the parties filed cross-motions for summary judgment and the district

---

[4]    In a brief footnote, and without giving reasons, the court also rejected Plaintiffs' contention that the Buffet was a "single site of employment." *Id.* at *4 n.3.

13

court granted one motion but denied the other." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 576-77 (2d Cir. 2019) (internal quotation marks and brackets omitted). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see also* 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure* § 2720 (4th ed. 2022) ("[T]he mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a [finder of fact]."). Rather, the court evaluates each party's motion "on its own merits," and "all reasonable inferences" are drawn "against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

Summary judgment is proper only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Atlas Air, Inc.*, 943 F.3d at 577 (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008); Fed. R. Civ. P. 56(c)). We do "not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005). We may find for the moving party "only if we conclude that on the record presented, considered in the light most favorable

to [the non-moving party], no reasonable [fact-finder] could find in [its] favor." *Capobianco v. City of New York*, 422 F.3d 47, 54-55 (2d Cir. 2005). We do not ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded [fact-finder] could return a verdict for the [non-moving party] on the evidence presented." *Jeffreys*, 426 F.3d at 553 (internal quotation marks omitted).

**B.** *Applicable Law*

**1.** *The WARN Act*

The WARN Act "requires employers to give employees 60 calendar days' notice in advance of plant closings and mass layoffs." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013) (citing 29 U.S.C. § 2102(a)(1)). The requirement generally applies to employers who employ 100 or more full-time employees. *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citing 29 U.S.C. § 2101(a)(1)). A "plant closing" is defined as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment." 29 U.S.C. § 2101(a)(2).[5]

---

[5] In contrast, a "mass layoff" is "a reduction in force," which, *inter alia*, "is not the result of a plant closing" and "results in an employment loss at the single site of employment during any 30-day period." *Id.* § 2101(a)(3)(A)-(B). The statute provides various thresholds for reductions in force to qualify as mass layoffs. *Id.* Here, Plaintiffs do not contend that Genting carried out a mass layoff.

15

Accordingly, an employer who shuts down a "single site of employment" or an "operating unit," terms whose meaning we discuss below, must give notice to all employees who would reasonably be expected to lose their jobs as a result, whether they work inside or outside the site or operating unit. *See id.* §§ 2102(a)(1), 2101(a)(5).

Unless an exception applies, a covered employer violates the WARN Act when it "order[s] a plant closing or mass layoff without providing each employee, either individually or through [her or his] representatives, with sixty-days advance notice." *Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995) (citing 29 U.S.C. § 2102(a)). The employer is liable to each affected employee for that employee's compensation for each day the required notice was not provided, "up to 60 days of pay and benefits." *Guippone*, 737 F.3d at 225 (citing 29 U.S.C. § 2104(a)(1)). A civil action for damages under the WARN Act is "the exclusive remedy for any violation of this chapter." *Loc. 217, Hotel & Rest. Emps. Union v. MHM, Inc.*, 976 F.2d 805, 808 (2d Cir. 1992) (brackets omitted) (quoting 29 U.S.C. § 2104(b)).

The WARN Act's "primary" purpose is "remedial." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1159 (9th

Cir. 2001). The statute "was adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s." *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999). During that period, companies "were merged, acquired, or closed," causing "many employees [to] lo[se] their jobs, often without notice. In some circumstances, the projected closing was concealed from the employees." *Id.* Accordingly, "[b]y requiring advance notice, the WARN Act aims to 'provide workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market,' and allows the state to provide prompt assistance to displaced workers." *Guippone*, 737 F.3d at 225 (brackets omitted) (quoting 20 C.F.R. § 639.1(a)). Because it is a remedial statute, we construe the WARN Act's terms liberally. *See N.C. Freed Co. v. Bd. of Governors of Fed. Rsrv. Sys.*, 473 F.2d 1210, 1214 (2d Cir. 1973) (where a "statute is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.").

## 2. *Implementing Regulations*

The WARN Act confers upon the DOL authority to "prescribe such regulations as may be necessary to carry out" the statute. 29 U.S.C. § 2107(a).[6] The regulations implementing the WARN Act define, *inter alia*, the terms "single site of employment" and "operating unit." 20 C.F.R. § 639.3. Whereas the definition of a single site of employment contains eight distinct clauses, *see id.* §§ 639.3(i)(1)-(8), the definition of an operating unit is briefer: The term "refers to an organizationally or operationally distinct product, operation, or specific work function within or across facilities at the single site," *id.* § 639.3(j). Along with the regulations, the Secretary of Labor published in the Federal Register a preamble containing the DOL's responses to public comments. Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042 (April 20, 1989). As we discuss below, the preamble addresses the scope of the terms "single site of employment," *see id.* at 16049-50, and "operating unit," *see id.* at 16050-51.

To give force to the WARN Act's regulations, "we look to the plain language of the regulatory text, which we consider in light of its purpose, as

---

[6] "Such regulations shall, at a minimum, include interpretative regulations describing the methods by which employers may provide for appropriate service of notice as required by this chapter." *Id.*

18

stated in the regulation's preamble . . . as well as the purpose of the regulation's authorizing statute." *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 50 (2d Cir. 2017) (internal quotation marks omitted). In general, we give effect to the DOL's regulations unless "they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).[7] When the agency's interpretation of a regulation is at issue, "although we will generally defer . . . so long as the interpretation is not plainly erroneous or inconsistent with the law," such interpretations "are not binding and do not have the force of law." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 559 (2d Cir. 2012) (internal quotation marks omitted). Yet even where the text of a regulation is unambiguous and we do not give deference, any regulatory preamble is still "persuasive because it rests on a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 561 (quoting *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 424 (S.D.N.Y. 2010); *cf. Guippone*, 737 F.3d at 226 (characterizing DOL regulations as "the best method for determining WARN Act liability because they were created

---

[7]     *Accord Easom v. US Well Servs., Inc.*, 37 F.4th 238, 245 (5th Cir. 2022); *Schmidt v. FCI Enterprises LLC*, 3 F.4th 95, 101 (4th Cir. 2021); *Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013); *Ellis v. DHL Exp. Inc. (USA)*, 633 F.3d 522, 526 (7th Cir. 2011).

with WARN Act policies in mind and focus particularly on circumstances

relevant to labor relations" (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d

471, 490 (3d Cir. 2001) (internal quotation marks omitted))).

Here, the parties do not argue that the DOL's definition of either a

"single site of employment" or an "operating unit" is ambiguous. Instead, as we

noted in our order inviting the DOL to share its views on this issue, the parties

have "diverging interpretations of the statutory and regulatory language." ECF

Dkt. No. 87 at 2. Accordingly, while we do not defer either to the regulatory

preamble or to the DOL's further comments in its *amicus* brief, we consider these

materials to the extent they offer persuasive guidance that helps resolve the

issues on appeal. *See Ramos*, 687 F.3d at 561.[8]

---

[8] Characterizing the DOL's submission as "improper" and a usurpation of the
Court's authority, Genting objects to our considering the *amicus* brief for any purpose
"other than its views on the referenced terms." Genting Response Mem., ECF Dkt. No.
113 at 1-3. In the alternative, Genting argues that the DOL's views, "[i]f considered . . .
should not be given a high level of deference." *Id.* at 3. For the reasons just discussed,
we find that the DOL's brief provides persuasive guidance and is not inconsistent with
the WARN Act's remedial purpose. *See* 20 C.F.R. § 639.1(a). Moreover, we reject
Genting's contention that the DOL's submission goes beyond the scope of our order
requesting the DOL's views. We solicited "any views" that the DOL "may wish to share
on [the] issue" of "whether Defendant-Appellee's buffet restaurant constituted an
'operating unit' under the [WARN Act]." ECF Dkt. No. 86 at 2.

20

### i. *Single Site of Employment*

The regulations implementing the WARN Act provide that a "single site of employment" refers either to "a single location or a group of contiguous locations." 20 C.F.R. § 639.3(i)(1). The regulations explain that "[t]here may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building." *Id.* § 639.3(i)(2). Additionally, "[c]ontiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment." *Id.* § 639.3(i)(5); *see also* Worker Adjustment and Retraining Notification, 54 Fed. Reg. at 16050. Other Circuits have noted that "[t]aken together, these regulations suggest that proximity and contiguity are the most important criteria for making single site determinations." *Frymire*, 61 F.3d at 766. "[O]nce a court makes the contiguous/non-contiguous determination, the operational, managerial[,] and labor variables become the decisive factors and can defeat or reinforce the presumptions established by the proximity and contiguity factors." *Id.*; *see also, e.g.*, *Likes v. DHL Express (USA), Inc.*, 787 F.3d 1096, 1100 (11th Cir. 2015).

### ii. *Operating Unit*

As noted above, the regulations define an "operating unit" as "an organizationally or operationally distinct product, operation or specific work function." 20 C.F.R. § 639.3(j). The DOL characterizes this as a "common sense definition[]" aimed at demarcating "physically and operationally distinct entities." Worker Adjustment and Retraining Notification, 54 Fed. Reg. at 16050. In determining what constitutes an operating unit, the DOL opined, the "critical factor . . . [is] the organizational or operational structure of the single site of employment." *Id.* Among sources relevant to the inquiry are "applicable collective bargaining agreements, the employer's organizational structure[,] and industry understandings of what constitute distinct work functions." *Id.*; *see, e.g.*, *Pavao v. Brown & Sharpe Mfg. Co.*, 844 F. Supp. 890, 895 (D.R.I. 1994) (holding that a consolidated parts manufacturing department was an "operating unit" because it had its own managers, a separate budget, its own "cost center" department number, and a separate work force of part-making specialists).

To illustrate its "view of the appropriate limits of the definition," the DOL has offered "illustrative" examples. *Id.* at 16050-51; *see also* Amicus Br. at 6-8. For instance, "[i]f an automobile manufacturing plant has an assembly line

22

which assembles cars, there may be groups of workers whose job is to put on the doors or the bumpers. The operating unit should be the assembly line, not the groups of workers who perform the task of door or bumper assembly." 54 Fed. Reg. at 16050. Before us, the DOL stresses that an entity need not be able to "function as [an] independent compan[y]" to be an operating unit. Amicus Br. at 5. "An assembly line at an automobile manufacturing plant, a data-processing department, a housekeeping department, a clerical pool, and a product department at a department store could all qualify as operating units, even though none would reasonably be expected to stand on its own as a subsidiary company." *Id.* (citing 54 Fed. Reg. at 16050-51). Crucially, both in the preamble to its regulations and before us, the DOL cautions that the term "operating unit" is not susceptible to bright-line definition. The determination whether workers constitute an operating unit "will depend on how they are organized and how they operate." 54 Fed. Reg. at 16051. What is required is a "fact-intensive analysis, based on the totality of available evidence." Amicus Br. at 6; *see also* 6-8.

      **3.**    *The New York WARN Act*

        Like the federal statute, the New York WARN Act requires that qualified employers give employees advance notice of a plant closing or mass

layoff. N.Y. Lab. Law § 860-b; *see also id.* § 860-b(2) ("An employer required to give notice . . . under this article shall include in its notice the elements required by the federal Worker Adjustment and Retraining Notification Act (29 U.S.C. 2101 *et seq.*).").[9] Under the state statute, notice must be given ninety, rather than sixty, days in advance. *Id.* The state statute applies to employers who "employ [50] or more" full-time employees, rather than 100. *Id.* § 860-a(3). Moreover, the New York statute provides lower thresholds for a "plant closing" or a "mass layoff" to trigger the requirement of advance notice. *Compare* N.Y. Lab. Law §§ 860-a(4), (6) *with* 29 U.S.C. §§ 2101(a)(2), (3). Accordingly, where there is liability under the WARN Act, there is necessarily liability under the New York WARN Act.

Plaintiffs allege violations of both WARN Acts. The parties do not dispute whether the state regulations are similar to the DOL's regulations.[10] For

---

[9] In keeping with its federal counterpart, the New York WARN Act's purpose is to "give affected employees . . . more time to get their finances in order, explore health care options, find another source of income, or begin training for future employment." Introducer's Memorandum in Support, Governor's Bill Jacket, L. 2008 S. 8212, ch. 475, at 8. The statute was also intended to "establish a more stringent state WARN notice requirement" in comparison to federal law. *Id.*

[10] Indeed, the New York WARN Act regulations use the same relevant terms -- "plant closing," "single site of employment," and "operating units -- as the WARN Act regulations and apply similar definitions and examples. *Compare* N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(k), (m), (p) *with* 20 C.F.R. § 639.3(b), (i), (j).

that reason, our analysis focuses on the federal law and its regulations but applies equally to Plaintiffs' New York WARN Act claims. *See Debejian v. Atl. Testing Lab'ys, Ltd.*, 64 F. Supp. 2d 85, 87 n.1 (N.D.N.Y. 1999).

C.    *Application*

On appeal, Plaintiffs contend the district court erred when it concluded as a matter of law that the Buffet's closure did not constitute a "plant closing" on the ground that the Buffet was neither a "single site of employment" nor an "operating unit." *Roberts v. Genting New York LLC*, 2021 WL 950055 at *4; *see* Appellants' Br. at 15-25; Appellee's Br. at 22-23. While there are facts in the record that support the district court's conclusions, other facts in the record support Plaintiffs' argument that the Buffet was sufficiently distinct, both organizationally and operationally, to constitute an operating unit and thus come within the protection of the WARN Acts. Because a reasonable fact-finder[11]

---

[11]    It is an open question whether a judge or jury would be the appropriate finder of fact in a suit for damages under the WARN Acts. "Few courts have decided whether there is a right to a jury trial under the WARN Act," *Creech v. Virginia Fuel Corp.*, 61 F. Supp. 3d 592, 593 (W.D. Va. 2014), but the majority view is that there is not such a right because, *inter alia*, remedies under the Act are equitable rather than legal in nature. *See, e.g., Bledsoe v. Emery Worldwide Airlines*, 635 F.3d 836, 840-45 (6th Cir. 2011); *Fleming v. Bayou Steel BD Holdings II LLC*, 580 F. Supp. 3d 349, 2022 WL 168393 (E.D. La. Jan. 19, 2022); *Morris v. Moon Ridge Foods*, 2019 WL 7593902 (W.D. Mo. Aug. 14, 2019). *But see Carlberg v. Guam Indus. Servs.*, 2017 WL 4381667 (D. Guam Sep. 30, 2017). Because the

could determine that the Buffet was an operating unit, we conclude neither side is entitled to summary judgment.[12]

### 1. *Operational Independence*

In determining whether an operating unit exists, no single consideration is dispositive. *See* Amicus Br. at 4, 6, 8. We begin with the Buffet's dependence on other entities within the Casino because the district court analyzed this factor most extensively.

The district court agreed with Genting "that the Aqueduct Buffet was not operationally separate and distinct from the rest of the casino." *Roberts v. Genting New York LLC*, 2021 WL 950055, at *4. In support of this conclusion, the district court cited the Buffet's dependence on the Casino's centralized services, including "recipes, ingredients, supplies, storage, cleaning, human resources, legal issues, payroll, and insurance and accounts payable." *Id.* at *5-*6. The

---

issue was not raised in the district court and has not been addressed on appeal, we do not reach the question and leave it to the district court to resolve in the first instance on remand, after giving the parties an opportunity to be heard.

[12] Under the regulations implementing the WARN Acts, an "operating unit" exists "within a single site of employment." 54 Fed. Reg. at 16065. Neither party disputes that the Casino, taken as a whole, constitutes a single site of employment. Because our conclusion that a reasonable fact-finder could determine that the Buffet was an operating unit is sufficient to vacate the district court's grant of summary judgment and remand the case, we do not reach the parties' dispute about whether the Buffet was itself a single site of employment.

district court's analysis in this respect tracks that of Genting's expert Bjorn Malmlund. *Compare id.* at \*5-\*6 *with* J. App'x at 221-29.[13] The district court did not, however, fully recognize the implications of the fact that Malmlund, who had never before offered testimony concerning the scope of the WARN Acts, all but redefined the term "operating unit" in his report and deposition testimony. In place of the definition contained in the implementing regulations, Malmlund consistently employed the shorthand phrase "*independent* operating unit" (emphasis added). J. App'x at 221. Moreover, he supplemented the DOL's definition of "operating unit" with three other definitions that, he wrote, "are commonly used and generally accepted from an accounting/operational perspective." *Id.* at 222. Each of Malmlund's supplementary definitions identifies an operating unit as a "subsidiary" that resembles "an independent company." *Id.* As the DOL notes, Malmlund's supplementary definitions are "incompatible with the WARN Act" and its implementing regulations. Amicus

---

[13] In this appeal, Plaintiffs ask us to reverse not only the district court's orders granting Genting's summary judgment motion and denying Plaintiffs' motion, but also the district court's evidentiary ruling allowing Malmlund's expert testimony. Because we hold that the district court erred in granting Genting's motion for summary judgment on other grounds, we do not reach Plaintiffs' evidentiary argument. Even assuming Malmlund's testimony is admissible, it is not by any means dispositive, and as discussed below, issues of fact still remain for trial.

Br. at 5.[14]  To read the term "operating unit" to encompass only entities that could exist independently would drastically limit the protections of the WARN Act, contravening the statute's purpose "to apply the protections of the law to small units of workers in a larger plant when their units are closed."  54 Fed. Reg. at 16051; *see* Amicus Br. at 5-6.  Thus, to the extent that Malmlund suggested that an entity must be independent to be an operating unit, his testimony rests upon an erroneous reading of the law.

The district court and the dissent are correct that the Casino provided the Buffet with centralized services, including purchasing, warehousing, human resources management, and cleaning.  But the Buffet's reliance on these centralized services is not, as a matter of law, fatal to a determination that it was an operating unit.  Indeed, the "illustrative" examples of operating units given by the DOL include an assembly line at an automobile manufacturing plant, a data-processing department, a housekeeping department, a clerical pool, and a product department at a department store.  The DOL

---

[14]     Malmlund acknowledged as much at his deposition.  He said that the WARN Act regulations' reference to an entity that is "organizationally an[d] operational[ly] distinct" is "sort of a synonym for . . . being independent."  J. App'x at 1355-56.  He admitted that the WARN Act and its implementing regulations do not use the term "independent" and that he chose the word because it "might have been reflected in . . . some of the internet interpretations or definitions of an operating unit."  *Id.* at 1356.

concluded that all of these could be operating units, even though none could reasonably be considered an independent, subsidiary company. Amicus Br. at 5-6. Indeed, the Buffet was arguably *less* dependent on the Casino than the DOL's hypothetical units would be dependent on the larger entities of which they would have been part.

**2.** ***Other Factors***

In determining whether the Buffet was operationally and organizationally distinct, and thus an operating unit for WARN Act purposes, a fact-finder might deem other elements of the record helpful. Some favor Plaintiffs; others support Genting. That the record is equivocal is not surprising: The DOL advises us that in WARN Act cases, "[t]he ultimate determination will depend on the circumstances of each case, and all relevant evidence should be considered in the evaluation." Amicus Br. at 8. Contrary to the view of our dissenting colleague, the "somewhat mixed" summary judgment record in this case is insufficient to establish, as a matter of law, that the Buffet was not an operating unit. *Id.*

Consider, first, the evidence concerning the Buffet's physical location. Robert Netter, vice president of food and beverage at the Casino,

testified that it occupied an area separate from other retail outlets and amenities. It did not share space with any other restaurant. The Buffet had a single entrance for guests, who had to pass by a cashier station before being seated by a host. Although a reasonable fact-finder could consider these facts as evidence the Buffet was operationally distinct, the district court focused instead on the fact that, as an "open air" outlet, it was not separated from other parts of the Casino by walls or doors. *Roberts v. Genting New York LLC*, 2021 WL 950055, at *5.

Likewise, the record is mixed as to whether the Buffet, when compared to the Casino's other dining options, offered patrons a distinct experience. The strongest evidence in favor of this proposition is that no other food outlet in the Casino operated on an all-you-can eat basis. Some food items were unique to the Buffet. Other items, even though they were available elsewhere in the Casino, were "prepared differently" when served in the Buffet. J. App'x at 108. The Buffet's kitchen prepared the bulk of the hot items it served. Yet the Buffet was not wholly distinct: Cold items served there were generally prepared in the central *garde manger*, and Genting operated another all-you-can-eat buffet in the NYRA section of the building.

A more complex set of facts concerns the Buffet's staffing arrangements. The managers of the Buffet's kitchen and front-of-house area worked there full-time, had the word "Buffet" in their job titles, and oversaw the design of employee work schedules, subject to the approval of the F&B vice president. On this basis, a reasonable fact-finder could conclude that the existence of Buffet-specific managers who supervised Buffet employees and set their schedules weighs in favor of the Buffet's being an operating unit. Yet the district court's contrary conclusion, that the Buffet was part of a "common" and "centralized management structure" headed by the executive chef, is supported by other elements of the record, such as that the executive chef "determined what food would be served at each outlet." *Roberts v. Genting New York LLC*, 2021 WL 950055, at \*6.

As to employees, those assigned to the Buffet typically worked there for at least six months, and their wages were allocated to the Buffet's cost center. *Cf. Pavao*, 844 F. Supp. at 895 (concluding that the Consolidated Parts Department was an "operating unit" under the federal WARN Act, in part, because it had its own "cost center" department number). On Genting's rosters, at least half of the employees whom the company laid off were assigned to

31

"Buffet" or "Buffet-Culinary" as their "Home Department." Genting did not treat

Buffet personnel as interchangeable with their counterparts at other food outlets;

for instance, the Casino rarely assigned Buffet servers to work in either of its fine

dining restaurants. These facts weigh in favor of the argument that the Buffet

was sufficiently organizationally and operationally distinct to be considered an

operating unit. The district court, however, gave greater weight to contrary

evidence, including the fact that the CBA did not identify the Buffet as a separate

department, division, or unit.[15] The court stressed that the CBA set "forth the

same job descriptions, salary and benefit structure, policies, and terms of

employment for cooks, food servers, food runners, bussers, hosts, cashiers,

stewards, and warehouse attendants, regardless of the food outlet." *Roberts v.*

*Genting New York LLC*, 2021 WL 950055, at *4. Moreover, deposition testimony

from former Genting employees suggests that these provisions were

implemented in practice. Prospective employees applied to a centralized human

---

[15] Genting contends we should defer to the Impartial Chairperson's November 2015 finding that the Buffet was not a separate and distinct department and that the word "department" in the CBA referred to the overall food and beverage department. J. App'x at 399. As the district court acknowledged, however, the chairperson was interpreting a contract rather than deciding issues of law related to the WARN Act or its accompanying regulations. *Roberts v. Genting New York LLC*, 2021 WL 950055 at *8. Nor is the validity of the chairperson's decision at issue in this appeal. Like the district court, we take the decision to constitute, "at most . . . persuasive authority." *Id.*

resources office, not to a particular restaurant or other amenity. After being

hired, food and beverage employees such as cooks, servers, and cashiers were

provided a common orientation; they were given a single employee handbook

and, for those who prepared food, a single culinary manual. In addition, some

employees, such as the executive sous chefs and the stewards, who worked in

the Buffet *also* staffed other food outlets. *Id*. Yet while these facts support the

district court's conclusion, it is for the finder of fact rather than the court on

summary judgment to weigh them against the facts Plaintiffs have highlighted.

As a final example, even the factual record concerning Buffet

employees' uniforms is susceptible to competing interpretations. The servers,

cashiers, and bus persons who worked at the two buffets Genting operated -- the

Buffet and Equestrius -- wore different color shirts or other top garments than

their counterparts at the Casino's other food outlets. While this detail provides

further support for the conclusion that the Buffet was distinct, it is also true that

cooks, stewards, and hosts wore the same uniform throughout the Casino, and

Buffet employees wore the same pants as employees elsewhere. As with the

other factors we have discussed, how to weigh these minor but observable

differences in the overall analysis of the Buffet's organizational and operational distinctiveness is a question for a finder of fact.

There are additional examples, but the outcome remains the same: When the evidence is considered in the light most favorable to Plaintiffs, issues of material fact that are genuine and more than "superficial," *see* Dissent at 8, exist with regard to whether the Buffet was organizationally and operationally distinct enough from the rest of the Casino to merit being designated an operating unit for WARN Act purposes. Genting is not entitled to summary judgment because a reasonable finder of fact could conclude that the Buffet was, in fact, an operating unit. Likewise, to the extent Plaintiffs argue on appeal that the district court erred in failing to grant summary judgment in their favor, we are not persuaded, for, as discussed above, there is also evidence in the record to support the conclusion that the Buffet was not an operating unit. It will be for the finder of fact at trial to weigh the evidence comprising the "somewhat mixed" record in this case to answer the question. Amicus Br. at 8. We conclude the district court erred in granting summary judgment for Genting and in dismissing Plaintiffs' claims under the WARN Acts.

## *CONCLUSION*

For the foregoing reasons, the judgment of the district court is AFFIRMED to the extent it denied Plaintiffs' motion for summary judgment and it is VACATED to the extent it granted Genting's motion for summary judgment and dismissed the complaint, and the case is REMANDED for further proceedings.

RICHARD J. SULLIVAN, Circuit Judge, Dissenting:

Because Plaintiffs have not shown that the Aqueduct Buffet is subject to the notice requirement of the Federal and New York WARN Acts, I would affirm the district court's order denying Plaintiffs' motion for summary judgment and granting Resorts World's cross-motion for summary judgment dismissing Plaintiffs' complaint.

Under the Federal WARN Act, business enterprises with 100 or more full-time employees must provide a written notice to each affected employee or their representative at least sixty days before a "plant closing."  29 U.S.C. §§ 2101(a)(1)(A), 2102(a)(1).  A "plant closing" is defined as "the permanent or temporary shutdown of a *single site of employment*, or one or more facilities or *operating units* within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." *Id.* § 2101(a)(2) (emphases added).

The crux of this appeal is whether the Aqueduct Buffet constitutes an "operating unit" under the Federal and New York WARN Acts.[1]  Federal regulations define an "operating unit" for purposes of the Federal WARN Act as "an organizationally or operationally *distinct* product, operation, or specific work function within or across facilities at the single site."  20 C.F.R. § 639.3(j) (emphasis added).[2]  When promulgating these regulations, the Department of Labor ("DOL") has explained that "[t]he critical factor in determining what constitutes an operating unit will be the organizational or operational structure of the single site of employment"; the DOL further noted that "[s]ources of evidence which will assist in defining *separate* and *distinct* units" include "applicable collective bargaining agreements [and] the employer's organizational structure."  54 Fed. Reg. 16050 (April 20, 1989) (emphasis added); *see also Guippone v. BH S&B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013) ("[W]e agree with the Third Circuit that 'the

[1] The New York WARN Act largely mirrors the Federal WARN Act, though it has some differences.  *Compare* N.Y. Lab. Law §§ 860-a(3), a(6), 860-b(1), *with* 29 U.S.C. §§ 2101(a)(1), (a)(2), 2102(a)(1).  None of these differences, however, is relevant to this appeal.  Like the majority, my analysis therefore applies equally to Plaintiffs' claims under both statutes.  *See* Maj. Op. 23–25.

[2] Regulations promulgated under the New York WARN Act define "operating unit" almost identically, as "an organizationally or operationally distinct product, operation, or specific work function within or across facilities at a single site of employment."  N.Y. Comp. Codes R. & Regs. tit. 12 § 921-1.1.

DOL factors are the best method for determining WARN Act liability.'" (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 490 (3d Cir. 2001))).

The district court granted summary judgment dismissing Plaintiffs' claims, concluding that Plaintiffs' asserted operating unit – the Aqueduct Buffet – did not satisfy the definitions of "operating unit" under the Federal or New York WARN Act. I agree.

As a threshold matter, I join the majority in concluding that we owe no deference to the DOL's interpretation of the statute and regulations offered in its amicus brief. *See* Maj. Op. at 20. "Where . . . an agency advances a statutory interpretation in an amicus brief that has not been articulated before in a rule or regulation, we do not apply the high level of deference due under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 (1984)." *Conn. Off. of Prot. & Advoc. For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 239 (2d Cir. 2006). Similarly, when the agency's regulation implementing the statute "is not ambiguous," we afford no deference to the agency's interpretation of its own regulation because, in such a case, "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." *Christensen v. Harris County*, 529 U.S. 576, 588

3

(2000); *see also Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 603 (2d Cir. 2020) ("[C]ourts do not give deference to agency interpretation of its own regulation when [the] regulation is unambiguous."). Here, "the parties do not argue that the DOL's definition of either a 'single site of employment' or an 'operating unit' is ambiguous." Maj. Op. at 20. Therefore, like the majority, I see no reason to "defer . . . to the DOL's . . . comments in its amicus brief." *Id.*

I disagree with the majority only because, to my mind, the "facts in the record" do not "support Plaintiffs' argument that the [Aqueduct] Buffet . . . constitute[s] an operating unit and thus come[s] within the protection of the WARN Acts." Maj. Op. at 25. When "the text of a regulation presents no ambiguity, . . . we are simply tasked with the application of an unambiguous regulation to the particular facts of a case." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 559 (2d Cir. 2012) (internal quotation marks omitted). Here, the DOL's regulations define "operating unit" as "an organizationally or operationally *distinct* product, operation, or specific work function." 20 C.F.R. § 639.3(j) (emphasis added). The word "distinct" in the regulation's text provides all that is needed for us to determine whether the Aqueduct Buffet constitutes an operating unit under the WARN Acts. *See Olagues v. Perceptive Advisors LLC*, 902

4

F.3d 121, 129 (2d Cir. 2018) (holding that, when interpreting an agency's regulation, "we . . . begin with the text of the regulation and go no further unless an ambiguity in the language so requires"). Under the plain meaning of the word "distinct," an operating unit must be "recognizably different in nature from [another operation] of a similar type." *Distinct*, *New Oxford American Dictionary* (3d ed. 2010); *see also Distinct*, *Webster's Third New International Dictionary* (2002) (defining distinct as "characterized by qualities individualizing or distinguishing as apart from, unlike, or not identical with another or others"); *Distinct*, *Garner's Modern English Usage* (4th ed. 2016) (defining "distinct" as "well defined, discernibly separate"). Therefore, contrary to the majority's suggestion, it is not enough for the Aqueduct Buffet to merely differ from the rest of the Resorts World in certain respects, Maj. Op. at 29–34; instead, the Aqueduct Buffet must be "discernibly separate" from the operation or organization of the casino to constitute an operating unit under the WARN Acts.

Applying the "unambiguous regulation to the particular facts" of this case, I cannot conclude that the Aqueduct Buffet meets this definition of an operating unit under the WARN Acts. *Ramos*, 687 F.3d at 559 (internal quotation marks omitted). First, the Aqueduct Buffet was not discernably separate from the

5

operation of the rest of Resorts World. The record reflects that the Aqueduct Buffet purchased food through Resorts World's centralized purchasing department, stored the purchased food items in a centralized warehouse, prepared cold dishes at a centralized cold kitchen, relied on the support of a centralized stewarding department, and conducted cleaning of its large equipment through a centralized environmental service department. Plaintiffs also testified that they were recruited to join the general Food & Beverage Department, not the Aqueduct Buffet specifically, and that they were rotated among the various food outlets within the Food & Beverage Department. Resorts World's Collective Bargaining Agreement with the union, moreover, provided uniform salary structures, benefits, employment terms, job classifications, and job descriptions for all non-managerial employees, irrespective of the food outlet. To me, the district court did not err in concluding that the Aqueduct Buffet was not operationally distinct from the rest of Resorts World.

Second, the Aqueduct Buffet's organizational structure was not discernably separate from that of the rest of the casino. All of Resorts World's food outlets, including the Aqueduct Buffet, were collectively managed by an Executive Chef and Assistant Director of Food and Beverage. The Executive Chef and Assistant

Director reported to the Director of Food and Beverage, who then reported to Resorts World's Chief Operating Officer and Vice President of Food and Beverage. The Executive Chef, the Director, and the Assistant Director oversaw all thirty food outlets at Resorts World, assisted by Executive Sous Chefs who "rotat[ed] all day long, walking through different kitchens" to ensure quality control of the food products and compliance with Resorts World's policies and procedures. J. App'x at 267. In short, the Aqueduct Buffet was not organizationally distinct, as it did not have its own managerial structure and was instead under the collective management of Resorts World's Food and Beverage Department – just like all other food outlets in the casino.[3]

The majority points to several differences between the Aqueduct Buffet and other food outlets in the Resorts World casino – such as the fact that "no other food outlet in the [c]asino operated on an all-you-can eat basis," that "[t]he managers of

---

[3] I would also conclude that the district court correctly rejected Plaintiffs' alternative assertion that the Aqueduct Buffet was a "single site of employment" under the Federal and New York WARN Acts. Sp. App'x at 8 n.3; *see also* Plaintiffs' Br. at 24–25. The regulations explain that "[a] single site of employment can refer to either a single location or a group of contiguous locations," 20 C.F.R. § 639.3(i)(1), and "[s]eparate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment," *id.* § 639.3(i)(3). Here, Resorts World – not Aqueduct Buffet – was the single site of employment, as there was only one company, one management, and one building that housed all employees across all departments.

the [Aqueduct] Buffet's kitchen and front-of-house area . . . had the word 'Buffet' in their job titles," and that employees working at the Aqueduct Buffet "wore different color shirts or other top garments than their counterparts at the [c]asino's other food outlets." Maj. Op. 29–34. But these plainly superficial differences do not disturb the district court's finding that the Aqueduct Buffet was "dependent on," and not operationally or organizationally separate from, the rest of the Resorts World. Sp. App'x at 10.

For all these reasons, I respectfully dissent from the majority's opinion and would affirm the district court's grant of summary judgment dismissing Plaintiff's complaint.